**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Case No. 1:19-cv-02375-DLF**

JEFFREY PETER DATTO, Ph.D.,

               Plaintiff,

v.

ASSOCIATION OF AMERICAN
MEDICAL COLLEGES, et al.

               Defendants.

_____/

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

The President of the United States has recently said in response to the rise in mass shootings that "Mental illness and hatred pull the trigger, not the gun." Plaintiff agrees with our President.  The Association of American Medical Colleges ("AAMC") is the "academic home of medical educators" TAC[1] ¶ 39. If the AAMC condones discrimination against the mentally ill who are disabled that only fuels the flames of hatred across our nation.  Plaintiff, who has no criminal record, does not condone violence, but he does understand frustration, the frustration of a population in our nation who does not want to be known. A population in our nation where police can enter into their home without a warrant, despite never making any threats, put them in handcuffs, and commit them into a psychiatric hospital against their will because they are deemed "a danger to themselves and others."  A population in our nation who can be tied down to a board and have medications injected into them against their will if they refuse to take them orally.  A population in our nation who are forced to stay medicated or else they can't leave

---

[1] TAC means Third Amended Complaint.  ECF No. 205.

psychiatric hospitals.  A population in our nation who can be locked in a small padded room with no TV, no cell phone, no nothing, at the mercy of the AAMC-trained doctor who determines when/if they are ever released just because they are deemed to be a "danger to themselves or others," even if they never made any threats and have no criminal history.  Plaintiff is well aware of the above because it has all happened to him.

The movements for women's rights and African-American civil rights have gone to great lengths to expand those rights, but the rights for those who are mentally ill have lagged woefully behind.  We hide in the closet.  We don't want to be known.  We are afraid to ask to be accepted for who we are due to the violent hateful actions of a few in this population that has stigmatized us all.

There is an issue here that needs to be fixed.  The current situation allowing the "academic home for medical educators" to condone discrimination against this entire population is not the answer.  Hopefully, this Court will make a decision that will be the beginning of the end of "Mental illness and hatred pull[ing] the trigger," because we need the AAMC to teach medical educators acceptance, tolerance, and understanding of the need for the mentally ill to be integrated into the medical profession and have their shared experiences be part of the AAMC education to help lead to a solution for the crisis this country continues to face.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff defers to the background and procedural history found in AAMC's Motion to Dismiss, except for the allegation that Plaintiff stated in his original complaint that he applied to 10 medical schools.   What he said in the initial complaint is the following: "Plaintiff applied to each University defendant medical school through the AAMC's centralized application service

and paid the required fee." [ECF No. 1 ¶ 24].  Plaintiff never stated those were the only schools he applied to.

## ARGUMENT

## I.     PLAINTIFF DOES NOT FAIL TO STATE A CLAIM UNDER TITLE III OF THE ADA.

AAMC makes the following 6 arguments as to why this claim should not be allowed.[2] (1) AAMC is not "*a place of public accommodation*," (2) Title III does not cover AAMC's AMCAS service, (3) Even if it does, AAMC's AMCAS service is not discriminatory to those who are disabled, (4) AAMC should not have to include "disability" as a category in their optional self-identification page, (5) Because Plaintiff had full use of AAMC's AMCAS, AAMC is not required to make any reasonable modifications, (6) AAMC cannot be held liable for their refusal to change their LCME anti-discrimination standard to include disability.

Plaintiff responds to each of these 6 arguments as follows:

### 1.    AAMC is a place of public accommodation.

AAMC is not just a "private membership organization," it is a non-profit corporation. TAC ¶ 114.  It has a physical location at 655 K Street, NW, Suite 100, Washington, DC, 20001-2399. TAC ¶ 37. It is a facility with around 400 employees working there.  It offers several services out of that facility to the general public. TAC ¶ 34.  Plaintiff, a member of the general public, paid AAMC a fee to use their AMCAS service. TAC ¶ 35.  Also, AAMC is an other place of education. TAC ¶ 36.  AAMC states, "Dr. Datto's claims do not have anything to do with AAMC's training" [ECF No. 206 p. 12], but they are just trying to overly simplify what this

---

[2] Unlike their prior motion to dismiss [ECF No. 199], "Defendants…are not challenging in this motion whether Dr. Datto has adequately pleaded a disability within the meaning of the ADA." [ECF No. 206 p. 10 FN 9].

case is about.  Dr. Datto is a 44-year-old member of the general population.  He is not a 21-year-old, applying to medical schools, who is not sure exactly what part of medicine he ultimately wishes to pursue.  It is Plaintiff's desire to be an academic physician scientist and medical educator. TAC ¶ 42.  By AAMC condoning and allowing discrimination to preclude his admittance back into medical school, he is not able to take advantage of the training opportunities that he wants to participate in, offered by the AAMC, such as the Chief Medical Officer ("CMO") Leadership Academy (TAC ¶¶ 41-42), because having a medical degree is a prerequisite for them.

42 U.S.C.§ 12182(a) prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." And § 12181(7)(F) clarifies that, among other entities, service establishments "are considered public accommodations." In the case of *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, the 10th Circuit Court defines a "service establishment" under title III of the ADA to mean "a place of business or a public or private institution that, by its conduct or performance, assists [*9] or benefits someone or something or provides useful labor without producing a tangible good for a customer or client." *Id*. at 1231. AAMC is an establishment that offers several services. TAC ¶ 34 (See also https://www.aamc.org/services).  Judge Holmes from the 10th Circuit did dissent saying the service should be in exchange for a fee.  However, AAMC is a service establishment covered under his heightened criterion since they receive fees for their services. TAC ¶¶ 35, 38, 40.

AAMC argues that Plaintiff didn't try to access them through their physical location and thus the ADA is not relevant because it is not applicable to interactions with public accommodations over a website. However, as a matter of law, this argument fails.

Courts in the First, Second, and Seventh Circuits have held that the Americans with Disabilities Act applies to websites regardless of whether the website has any connection to a physical facility. *See, e.g., Morgan v. Joint Admin. Bd., Retirement Plan of the Pillsbury, Co., and others*, 268 F.3d 456, 459 (7th Cir. 2001) (citations omitted) ("An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store."); *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 576 (D. Vt. 2015) (website allowing consumers to access a digital library for a monthly fee is a place of public accommodation); [*6]  *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 202 (D. Mass. 2012) ("[Netflix's] Watch Instantly web site is a place of public accommodation and Defendant may not discriminate in the provision of the services of that public accommodation—streaming video—even if those services are accessed exclusively in the home.").

These cases rely on the reasoning that "excluding businesses that sell services through the Internet from the [Americans with Disabilities Act] would 'run afoul of the purposes of the [Act] and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages available indiscriminately to other members of the general public.'" *Id*. at 200 (citing *Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 20 (1st Cir. 1994)).

Courts in the Ninth, Sixth, and Third Circuits have adopted a more limited application of the Act. They have concluded that only physical places qualify as public accommodations, and that the Act applies only if goods and services provided by a public accommodation have a sufficient nexus to a physical place. *See, e.g., Earll v. eBay, Inc.*, 599 Fed. Appx. 695, 696 (9th Cir. 2015) ("Because eBay's services are not connected to any 'actual, physical place[ ],' eBay is

not subject to the ADA."); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010-11 (6th Cir. 1997) ("[A] public accommodations is a physical place"); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 614 (3rd Cir. 1998) ("[W]e do not find the term 'public accommodations ' [*7]  ... to refer to nonphysical access.").  The Third Circuit made this decision when the internet was in its infancy and likely did not envision the world as it is today 21 years later where brick and mortar stores are closing constantly, and internet stores and services are mainstays.

Furthermore, there is a sufficient nexus between the AAMC's AMCAS service and their physical location because all of their employees are located at and their operations and services occur at 655 K Street, NW, Suite 100, Washington, DC, 20001-2399. TAC ¶ 37.  Additionally, their learning center, which is located in the same building (TAC ¶ 38), offers in-house courses that Plaintiff is not able to partake in because he is being discriminated against and prevented from finishing his MD degree, and this credential is a course prerequisite. TAC ¶ 42.

### 2.   Title III does cover AAMC's AMCAS service

In order to go to medical school in this country you must go through AAMC's AMCAS service.  They have a lot of power and control over the fate of many aspiring doctors in this country.  AAMC's counsel has tried to compare AAMC's AMCAS to an insurance policy, a long-term disability plan, and a newspaper column.  None of these examples are places in which a service is performed in exchange for a fee and none are other places of education or a place where food is sold for consumption on the premises.

Additionally, the Supreme Court stressed Congress' "expansive purpose" that the ADA be "a 'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" See *Martin*, 532 U.S. 661 at 675, 680, 121 S.Ct. 1879, 149 L.Ed.2d 904.  Additionally, "[These]

statutes ... 'mandate[ ] reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled.'" *Harnett v. Fielding Graduate Inst.*, 400 F.Supp.2d 570, 576 (S.D.N.Y.2005) (quoting *Felix v. N.Y.C. Transit Auth.*, 324 F.3d 102, 107 (2d Cir.2003)). All the Plaintiff is trying to do in this case is to have the opportunity to be put on an even playing field with the non-disabled. He is trying to prevent discrimination due to a disability from not allowing him to move forward in his career path as an academic physician scientist and medical educator, and thus not allowing him to be integrated into the economic and social mainstream of life. All roads to accomplish his career path lie through the AAMC. These barriers in place, which prevent that from happening for him and others similarly situated, need to come down.

> "Americans with disabilities often faced barriers to joining and succeeding in the workforce. These barriers were not limited to inaccessible physical structures. They also included attitudinal barriers resulting from unfounded stereotypes and prejudice. People with psychiatric disabilities have suffered as a result of such attitudinal barriers, with an employment rate dramatically lower than people without disabilities and far lower than people with other types of disabilities. *See* Jans, Stoddard & Kraus, *Chartbook on Mental Health and Disability in the United States*, U.S. Department of Education, National Institute on Disability and Rehabilitation Research, 2004, figure 11, www.infouse.com." *Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831 (7th Cir. 2005) at *5.

Furthermore, in AAMC's AMCAS application, "For the 'Institutional Action' question, AAMC says in their website instructions that 'You must answer 'Yes' even if the action does not appear on or has been deleted or expunged from your official transcripts due to institutional policy or personal petition." TAC ¶ 54. Although Plaintiff's transcript included academic dismissal, the explanation of events that occurred at Thomas Jefferson University ("TJU") were not included on Plaintiff's transcript or any other educational record;" (See TJU Transcript

attached hereto as Exhibit 1).[3] Both parties had settled the matter agreeing not to disclose them – a substantial settlement that resulted in total settlement payments of $240,000 to Plaintiff who settled the case pro se.  How is forcing Plaintiff to disclose that TJU held against him a disability now on his AMCAS application, without any ability to verify his disability, putting him on an equal playing field?  It is not.  That is why Plaintiff's accommodation requests are more than reasonable to ensure he is able to be on the same playing field.  The final determination of what happened at TJU, as determined by Dr. Claudia Baldasano, a Bipolar expert at the University of Pennsylvania (and several other experts – Dr. Arnold Goldman, Dr. Peter Badgio, Dr. Robert Toborowsky, Dr. Kathy Lawler, and Dr. Glenn Siegel), was not that the Plaintiff is not bipolar, but that in his fourth year of medical school he was on too much medication for someone who is Bipolar and that impacted his performance in the final year of medical school, having passed the USMLE Step I with a score of 220 (88th percentile) while medication free, which was higher than both the TJU and national averages, and matching in both a transitional year internship and Anesthesia residency program.

### 3.  AAMC's AMCAS service is discriminatory to those who are disabled.

According to the AAMC, "Dr. Datto has not alleged that he was unable to complete or submit an application through AMCAS…. Dr. Datto has not been denied access to any purported 'products' or 'services' by AAMC….. Dr. Datto, however, was not 'screened' or 'screened out' *from using AMCAS*."  [ECF No. 199 pp. 14-15]. Although what AAMC is saying is true, they apparently are not understanding what the claim is against them.  Plaintiff was able to use

---

[3] "[B]ecause the plaintiff is proceeding pro se, any additional exhibits, 'including those in [] opposition to [] [defendants'] motion to dismiss,' must be considered in construing the sufficiency of the plaintiff's claims. *Brown v. Whole Foods Market Grp., Inc.*, 789 F.3d 146, 152 (D.C.Cir.2015) (reversing dismissal order where district court did not consider 'the facts alleged in all of [the plaintiff's] pleadings' (emphasis in the original))." *Shinabargar v. Bd. of Trustees of Univ. of D.C., 164 F.Supp.3d 1 (D.D.C. 2016)* at *9.

AAMC's AMCAS.  Plaintiff never states he was screened out "from using AMCAS."  He was screened out by being forced to disclose a disability in an inappropriate section of the application that went unverified and thus not believed and/or misconstrued by the AAMC medical schools. Because of this, Plaintiff was denied the ability to ***fully and equally enjoy the service and advantage*** of AAMC's AMCAS.  The advantage of AAMC's AMCAS is that it is a data repository that is supposed to collect all the relevant information of an applicant, verify it, and then provide it to the AAMC medical schools.

Plaintiff did not equally enjoy this advantage of the service.  1) Some schools admittedly denied Plaintiff not believing he even had a disability and are also viewing such an unverified statement of disability as an excuse. TAC ¶¶ 67-68.  2) University of Miami ("UM") labelled Plaintiff's explanation, found in the personal statement (as AAMC argues it is a viable option in their motion to dismiss to explain it here), as a "Criminal Explanation." (See Exhibit 2 p. 19 (p. 20 if including cover page in count)) and placed "red flags" on his application because of it (See Exhibit 2 p. 1 (p. 2 if including cover page in count)). 3) Ohio State University ("OSU") denied his application and their Associate Dean for Admissions stated "schools would be more likely to take a chance on a student who was dismissed for pure academic reasons than one with professionalism failures." (See Exhibit 3). However, there were no professionalism failures at TJU.   His TJU transcript stated "Academic Dismissal."   (See Exhibit 1). His dismissal letter from TJU stated "You are given an Academic Dismissal based on a consistent inability to achieve a satisfactory academic record." (See Exhibit 4).   Plaintiff did not state any professionalism failures on his AMCAS application.[4]  Instead of being able to fully and equally

---

[4] The included evidence in this paragraph are obtained from UM and OSU. Other schools likely will produce similar evidence, once discovery is initiated against them, supporting that Plaintiff did not equally enjoy the advantage of the AAMC's AMCAS.

take part in the advantage of AAMC's AMCAS, Plaintiff was put at a disadvantage. As true to this situation, "*Many disadvantages faced by people with a disability are created by those around them*." (https://www.sbs.com.au/ news/comment- how-society-disables-people-with-disabilities).

There is a very simple and reasonable solution to prevent this disadvantage from happening now and in the future to those applying through AAMC's AMCAS application who had an academic issue caused by their disability.  Since there already is a 6-week verification process in place, those who want to disclose they have a disability could send in their medical documentation, and in the meantime AAMC could change their anti-discrimination policy to include disability discrimination. Thus, those medical schools who then want to hold a disability against someone could risk this affecting their accreditation with AAMC's LCME.

A case which supports Plaintiff's position is *Fiedler v. Am. Multi-Cinema, Inc.*, 871 F.Supp. 35, (D.D.C.1994), in which a quadriplegic wanted to not have to sit in the back row to watch movies at the AMC theater, but instead sit in the middle section.  Mr. Fiedler was able to access the AMC movie theater.  The ability to watch movies was also fully available to Mr. Fiedler, but the issue at stake was that he was not able to equally and fully enjoy the movie because he wanted to sit in the middle, a more enjoyable viewing location for him, but he had to sit all the way in the back.  As in this matter, Plaintiff was able to apply through AAMC's AMCAS.  He had full access to their service (just like Mr. Fiedler had full access into the movie theater and to the viewing of movies), but Plaintiff didn't equally and fully enjoy the benefits and advantages of the AMCAS service because he had to explain his disability unverified in a section that was admittedly not believed by some AAMC medical schools (TAC ¶¶ 218-219) and was being viewed also as a "criminal explanation" (Exhibit 2) and having "professionalism failures"

-10-

(Exhibit 3). Thus, Plaintiff did not enjoy the AMCAS service fully and equally because it relayed information that Plaintiff entered into the current form of their application to the AAMC medical schools in a manner that harmed him.

**4. AAMC should have to include "disability" as a category in their optional self-identification page.**

In support of this argument, Plaintiff attaches hereto as Exhibit 5 a declaration by Dr. Mark Salzer, a professor at Temple University and an expert on the need for collaborative and community inclusion of individuals with psychiatric disabilities.  Dr. Salzer states:

> 7. Those with mental illness are significantly more likely to have a disruption in their education verses the general population.
>
> 8. This is related to many factors, including the emergence or intensification of psychiatric symptoms and hospitalizations associated with the onset or exacerbation of major mental illnesses.
>
> 9. Accommodations should be made available to prevent a disruption due to a disability from forever stopping those with mental illnesses from completing their education.

Applicants should be allowed to self-identify themselves in their optional self-identification page as someone living with a disability if that's what they want to do.  The current alternative approach of disclosing this information, unverified, in the sections allowed by the AAMC is causing harm to the Plaintiff and others similarly situated, as already discussed above. The best way to overcome this is by allowing "disability" as a category in AAMC's optional self-identification page and allowing applicants to provide medical documentation verifying their disability.  The ability to identify oneself with all other protected classes is already included in the Birth & Sex section & The Self-identification Page. TAC ¶¶ 74-79, 143-148, 225-230. Allowing an applicant the opportunity to identify and verify a disability would mean that, in addition to the red flag being forced to be sent out, the AAMC could also send out a green check

mark to the AAMC medical schools that this is an applicant with a verified/certified disability. That will allow the AAMC medical schools to process this information however they deem necessary.  Plaintiff believes if an applicant has both a red flag and a green check mark on his application (and meets all other eligibility requirements to be interviewed at the AAMC medical schools), then it would be a reasonable accommodation for the AAMC medical schools to interview him and others similarly situated in person to discuss their past and their desire now to attend the AAMC medical schools.  Being able to understand and overcome the effects of a disability makes one a stronger applicant, not a weaker one.

Additionally, a Federal Court has already determined that providing an interview to a disabled medical school applicant with Bipolar Disorder is a reasonable accommodation in the admissions process. See *Manickavasagar v. Virginia Commonwealth University School of Medicine*, 667 F.Supp.2d 635 (E.D. Va. 2009).

> "The granted accommodation—the interview—presented the Plaintiff an opportunity to overcome his less than median record and his low ranking in the admissions process by performing well during an interview. As the Amended Complaint makes clear, the grant of interview is given to a small fraction of applicants, and thus, was a significant accommodation. Unfortunately for the Plaintiff, he performed poorly, thereby negating the effectiveness of the accommodation and underscoring the validity of the low rankings he had received earlier in the admissions process. The accommodation showed that the Plaintiff should not be admitted and no further accommodation was warranted. When viewed with proper deference, it cannot be said that the accommodation afforded to the Plaintiff by VCU was 'unreasonable' as a matter of law." *Id.* at 667.

According to 42 U.S.C. §12182(b)(2)(A)(I), a public accommodation shall not impose or apply "eligibility criteria that screen out, or tend to screen out, an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations."  AAMC's AMCAS application screened

Plaintiff out due to a disability by forcing him try to explain his unverified disability in a section being viewed negatively as discussed above.[5]   Plaintiff has all the medical reports on him substantiating that a disability substantially impaired him in his final year of medical school at TJU.   However, every AAMC medical school held this against him and no AAMC medical school's admissions committee ever even saw any of his medical records substantiating his disability.   They all had the red flag on his application due to how AAMC relayed his unverified disability to them, and thus they were not willing to accept Plaintiff into medical school despite his being more than qualified in all other regards. TAC ¶¶ 26-30.   Unlike Manickavasagar, Plaintiff isn't asking for any AAMC medical school to lower their academic standards, he is just asking for a fair opportunity to be interviewed by the AAMC medical schools and not hold against him an unverified disability affecting his past performance when it was not properly being treated.

**5. Plaintiff did not have the ability to fully and equally enjoy the service and advantage of AAMC's AMCAS, thus AAMC did have an obligation to make "modifications" in response to Dr. Datto's requests.**

In support of their argument, AAMC states "Dr. Datto had full use of the AMCAS application service.   He does not need any 'modifications' from AAMC."   However, full use doesn't mean he was able to fully and equally enjoy the service and advantage of AAMC's AMCAS, as already argued above and supported by the case of *Fiedler v. Am. Multi-Cinema, Inc.*, 871 F.Supp. 35, (D.D.C.1994).

**6. AAMC can be held liable for their refusal to change their LCME anti-discrimination standard to include disability.**

---

[5] Again, "For the 'Institutional Action' question, AAMC says in their website instructions that 'You must answer 'Yes' even if the action does not appear on or has been deleted or expunged from your official transcripts due to institutional policy or personal petition." TAC ¶ 54.

In support of their argument, AAMC states "His speculative allegations are also insufficient to establish any injury (much less any injury caused by AAMC)." [ECF No. 206 p. 17].  They also cite the case of *Shinabargar v. Bd. of Trustees of Univ. of D.C.*, 164 F.Supp.3d 1 (D.D.C. 2016).

However, "The 2017 AMCAS application guide states 'The AAMC **must ensure** high ethical standards for admission to and enrollment in medical schools.'"  TAC ¶ 248. Certifying that you read the application guide was a requirement before submitting the AMCAS application. TAC ¶¶ 246 -247.  By reading this statement Plaintiff believed that the AAMC would not allow disability discrimination to occur at the AAMC medical schools he was applying to through their AMCAS. This is the AAMC, the "Association of American Medical Colleges."  It is not some shady organization.  It is the home of the educators for the elite medical doctors in this country. When one reads that they must ensure high ethical standards, no reasonable person will be thinking that they will be allowing disability discrimination to occur, nor would any reasonable person think their Anti-discrimination policy does not pertain to the disabled.

At the time of applying to medical schools through AMCAS, Plaintiff was not aware of AAMC's Anti-Discrimination Policy accreditation standard.  It was not included in the initial complaint of this lawsuit, but was discovered by Plaintiff through his own investigations.  After initiating this litigation, Plaintiff included it for the first time in this Second Amended Complaint.

Additionally, in this matter, fraudulent misrepresentation as supported by the case of *Shinabargar* occurred.

In that case, the Court found that:

> "The plaintiff has also failed to allege sufficient facts to support
> her claim of fraudulent misrepresentation. The plaintiff alleges that

> "Defendant University promised Plaintiff an ABA Law School with an ABA 512 Complaint Process as ordered by the ABA on August 8, 2011," and that she relied on this alleged misrepresentation to enroll at UDC Law School. FAC ¶ 188. The plaintiff could not have possibly have relied upon any representations about ABA Standard 512 in making her decision to attend UDC Law School, however, because according to her own allegations, ABA Standard 512 was voted upon in August 2011, *id.* ¶ 97, when the plaintiff had already made her decision to attend UDC Law School by July 2011, *see* Pl.'s Opp'n, Ex. 33 (UDC Law School Registration Instructions Letter, dated July 18, 2011) at 189, ECF No. 54-1. Furthermore, the plaintiff admitted that she did not know about ABA Standard 512 until February 2012, following her suspension. FAC ¶ 95-96." *Id.* at *31.

Unlike *Shinabargar*, Datto relied on the "**must ensure** high ethical standards for admission to and enrollment in medical schools'" (TAC ¶ 248) found in the application guide, which the AAMC required he certify having read before submitting his application. TAC ¶ 247. However, Plaintiff was unaware that the Anti-discrimination standard did not include disability discrimination because that was found in a separate document that he was not required to read by the AAMC, and Plaintiff had to undergo his own investigation after filing his initial complaint to find it.  Thus, if the Court believes this promise to ensure high ethical standards did not form a contract then it at least should be able to go forward as a claim for fraudulent misrepresentation. However, Plaintiff does believe that promise forms a contract also because he was offered an opportunity to submit his AMCAS applications through the AAMC which states that "The AAMC must ensure high ethical standards for admission to and enrollment in medical schools." Plaintiff accepted that offer and in consideration paid to the AAMC their requested AMCAS fees, filled out their required applications, and prepared for and took AAMC's MCAT examination for which he had to pay additional fees to AAMC.  These were all requirements to submit AAMC's AMCAS application, and all were done by Plaintiff with consideration of this contract.

## II.     DR. DATTO DOES NOT FAIL TO STATE A CLAIM UNDER SECTION 504 OF THE REHABILITATION ACT

Plaintiff's claims under Section 504 do not fail for the same reasons why his ADA claims do not fail as stated above.  *See generally Harrison v. Rubin,* 174 F.3d 249, 253 (D.C. Cir. 1999) ("Claims and defenses under the two statutes are virtually identical.") (citation omitted). However, entities covered under this Act are recipients of federal funding, 29 U.S.C. § 794(b)(3)(A)(i), or principally engaged in the business of providing education and health care, 29 U.S.C. § 794(b)(3)(A)(ii).  To which, the AAMC is both. TAC ¶¶ 114-116.

## III.     DR. DATTO DOES NOT FAIL TO STATE A CLAIM UNDER THE DCHRA

Plaintiff's DCHRA claims do not fail for many of the same reasons that his claims do not fail under the ADA and the Rehabilitation Act.

First, AAMC is a "place of public accommodation" because AAMC is not just a "membership organization," it is a non-profit corporation.  TAC ¶ 114.  Its principal place of business is 655 K Street, NW, Suite 100, Washington, DC, 20001-2399. TAC ¶ 37.  In *Hertz Corp. v. Friend* 559 US 77, 130 S. Ct. 1181, 1184 175 L. Ed. 2d 1029 (2010), it states:

> We conclude that "**principal place of business**" is best read as referring to the **place** where a corporation's officers direct, control, and coordinate the corporation's activities. It is the **place** that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the **place** where the corporation maintains its headquarters-provided that the headquarters is the actual center of direction, control, and coordination."

The requirements, under the DCHRA, are less strict than the ADA because the ADA requires the place of public accommodation to also be a facility.  This requirement isn't part of the DCHRA definition for a place of public accommodation.  For the DCHRA, it just needs to

operate out of a place in the District of Columbia. Additionally, the DCHRA contains language that indicates its intent for what is discrimination and who is not allowed to discriminate is very broad:

> "It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination **for any reason other than that of individual merit**, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, status as a victim of an intrafamily offense, and place of residence or business." D.C. Code § 21401.01.

> "Every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, **including, but not limited to**, in employment, in places of public accommodation, resort or amusement, in educational institutions, in public service, and in housing and commercial space accommodations." D.C. Code § 2–1402.01

Also, AAMC states "educational institution is one in which **professors or teachers, using instructional material, follow a curriculum resulting in the increased skill or knowledge of their students**," quoting *U.S. Jaycees v. Bloomfield*, 434 A.2d at 1383. [ECF No. 206 p. 19].  Plaintiff is attaching hereto as Exhibit 6 a printout from AAMC's website describing its Chief Medical Officers (CMO) Leadership Academy.  The CMO academy is one of the "other educational" opportunities that Plaintiff is being prevented from being part of.  TAC ¶¶ 41, 195, 196.  It is clear from their website that in the CMO Academy you are paired with "**mentors**." (All mentors are teachers.  Not all teachers are mentors).  It's a "15 month executive training program;" "Fees include all **program materials**;" "this **curriculum**, designed by teaching hospital and health system CMOs;" "At the completion of this program, participants will be able to:…Develop administrative **skills** required to perform the CMO role." (See Exhibit 6, printed

from https://www.aamc.org/professional-development/leadership-development/cmo-leadership-academy). Thus, the description of the CMO Leadership Academy from AAMC's own website hits every single *U.S. Jaycees* requirement to be considered an other place of education under the Act.

Additionally, the AAMC cites the recent case of *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 39 (D.D.C. 2019) to try to convince the Court that the AAMC is not a place of public accommodation under the Act.   This argument is unavailing. The defendants in that matter are all online and virtual platforms (Google, Facebook, Twitter, and Apple) that do not operate out of or have their principal place of business in Washington, D.C.   AAMC has its physical location and principal place of business that it operates out of located at 655 K Street, NW, Suite 100, Washington, DC, 20001-2399. TAC ¶ 37.   As the Court in *Freedom Watch* makes clear "The court noted that the organization 'does not operate from any particular place within the District of Columbia.'" Thus, that is why these virtual platforms are not public accommodations under the DCHRA, whereas the AAMC, who operates out of its physical location in Washington, D.C., is a place of public accommodations under the DCHRA.

Finally, the AAMC is retaliating against Plaintiff.  Plaintiff asked for his last 2 reasonable accommodations for the first time within the past year. TAC ¶ 237.  First, he asked if they could include a question in the optional self-identification section asking applicants if they have/had suffered from a disability and for AAMC to verify the applicant's alleged disability.  TAC ¶¶ 211-216.   Second, Plaintiff requested as an accommodation for AAMC to change their accreditation standard 3.4 Anti-Discrimination Policy to include disability discrimination. TAC ¶ 222. AAMC's Anti-Discrimination Policy states "A medical school does not discriminate on the

basis of age, creed, gender identity, national origin, race, sex, or sexual orientation." TAC ¶ 223. Disability is not listed. TAC ¶ 224.

Plaintiff asked for both of these accommodations after initiating this litigation against the AAMC, and asked for both for the first time within the past year. TAC ¶ 237.   AAMC retaliated against Plaintiff in defiance of his rights under the DCHRA.

DCHRA § 2-1402.61.  Coercion or retaliation. states

> "(a)   It shall be an unlawful discriminatory practice to coerce, threaten, **retaliate against**, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or **enjoyment of any right granted** or protected under this chapter."

Being able to receive reasonable accommodations for a disability is a right granted under the Act.  The reasonable accommodation requests were most likely requests that the new CEO of the AAMC, Dr. Skorton, would have allowed if Plaintiff had not initiated this legal action against them and some of their AAMC medical schools.  Thus, Dr. Skorton and his AAMC retaliated against the Plaintiff.  Otherwise, they are not allowing the reasonable accommodation requests because they are being viewed as an unnecessary inconvenience having to accommodate applicants with disabilities in such a way.

If these 2 reasonable accommodations were allowed, Plaintiff would have resubmitted his AMCAS applications by now with a much greater chance of not being discriminated against, and if not accepted into an AAMC medical school, at least being interviewed by the schools he applied to and being given a chance to address any concerns about his past face-to-face with them. TAC ¶¶ 86, 155, 238.  Plaintiff deserves this opportunity.

IV.     **DR. DATTO DOES NOT FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT**

The 2017 Application guide states "The AAMC must ensure high ethical standards for admission to and enrollment in medical schools. Accordingly, if you are an applicant to medical school or a registrant for the MCAT, you must provide complete, current, and accurate information throughout the admission and examination processes." TAC ¶ 248 (See also ECF No. 206-1 p.12).  Plaintiff was required to certify he read this prior to submitting his application. TAC ¶¶ 246-247.    Additionally, this statement says "Accordingly."   It does not say "Exclusively," thus, "Accordingly" is what it means.  "Accordingly, also" the AAMC enforces its accreditation standard 3.4 Anti-Discrimination Policy through its Liaison Committee on Medical Education ("LCME").  AAMC's Anti-Discrimination Policy states "A medical school does not discriminate on the basis of age, creed, gender identity, national origin, race, sex, or sexual orientation." TAC ¶¶ 72, 141, 223.  There is an obvious omission of "disability" in their policy.  However, nowhere in their Application guide or anything one was required to read to submit an AMCAS application would have made an applicant know this issue with their anti-discrimination policy.  Even in this litigation, Plaintiff wasn't aware of this policy at the onset. There was no reference of it in the initial complaint, and no signs Plaintiff was aware of it. Plaintiff does believe this language in the Application guide created a contract with him that he was required to read before submitting his application and paying the fees for AAMC's AMCAS service.

V.      **DR. DATTO DOES NOT FAIL TO STATE A CLAIM FOR FRAUDULENT MISREPRESENTATION**

As discussed above, Plaintiff depended on the statement "AAMC must ensure high ethical standards for admission to and enrollment in medical schools" that he was required to read prior to applying, which caused him to believe he would not be discriminated against due to his disability by the AAMC medical schools.  Again, as already stated, AAMC is not some shady organization.  It is the home of the educators for the elite medical doctors in this country.  When one reads that they must ensure high ethical standards, no reasonable person will be thinking that they will be allowing disability discrimination to occur, nor would any reasonable person think their Anti-discrimination policy does not pertain to the disabled.

     AAMC argues that that statement is negated by this other statement contained in the same document: "**AMCAS** is not involved in the admission decision-making process.  These decisions are made solely by medical schools."  [ECF No. 206 p. 22].  However, that statement is true, but it says AMCAS is not involved, It does not say **AAMC** is not involved.  AAMC's AMCAS is not involved in the admission decision-making process, but AAMC's LCME is involved in ensuring the admissions process does not violate AAMC's accreditation standard, TAC ¶¶ 82-84, which includes AAMC anti-discrimination policy that is missing "disability" discrimination. TAC ¶¶ 72-73.  AAMC's own expert report, TAC ¶ 242, warned them of this issue ("Developing clear policies and procedures to facilitate inclusion and providing education about the benefits of inclusion are, among other approaches described in this report, critical to consider for countering these messages and helping improve the medical school culture for students with disabilities.").  What more of a clear policy can AAMC make than by including disability in their anti-discrimination standard?  But they failed to do it and still refuse to do it. Thus, they evidently knew of this issue and their refusal to make the simple change to add disability to their anti-discrimination policy now supports this fact. Additionally, as pointed out

in the Third Amended Complaint, AAMC changed the language from **must ensure** to **ensures** after 2017 (TAC ¶¶ 260-264), which also points to the fact that there are people internally at the AAMC who knew saying **must ensure** was misleading.   AAMC should either implement Plaintiff's requested accommodations or take out the current statement that "AAMC ensures high ethical standards for admission to and enrollment in medical schools" or put applicants on some notice for what applicants are required to read before applying that for some forms of mental illness disability AAMC allows discrimination to occur at their AAMC medical schools.

## VI.    DR. DATTO DOES NOT FAIL TO STATE A CLAIM AGAINST DR. SKORTON

According to the Third Amended Complaint, "Defendant, Dr. David Skorton, is President and CEO of the AAMC and is the top operational decision-maker at the AAMC in Washington, D.C". TAC ¶ 3.

As stated in the Third Amended Complaint, Ms. Caroline Mew was representing Dr. Skorton and Plaintiff again requested the past reasonable accommodation requests made within the past year to Dr. Skorton through Ms. Mew prior to filing the Second Amended Complaint. TAC ¶¶ 87, 232, 240.  Plaintiff really tried his best to avert having to bring forth the Second Amended Complaint, but Dr. Skorton refused to respond and/or implement the reasonable accommodation requests. TAC ¶¶ 87, 240.

As for the Title III ADA claim, it is true that monetary relief is not currently available, but the Plaintiff just recently filed a complaint with the U.S. Department of Justice on Nov 3, 2019 to investigate this matter. In accordance with 42 U.S. Code § 12188 (b)(1)(A)(i), "The Attorney General shall investigate alleged violations of this subchapter." It is uncertain right now if the Attorney General will want to intercede in these matters, following their investigation, but

if the Attorney General does then under 42 U.S. Code § 12188 (b)(2)(B) monetary damages are allowed to compensate the aggrieved.

As for the DCHRA claim, this is a case where Dr. Skorton is "alleged to have personally engaged in discriminatory conduct." Plaintiff personally directed the reasonable accommodation requests to him through his counsel Ms. Mew who represented him.  Dr. Skorton, being the CEO and top-operational officer at the AAMC, could have granted the reasonable accommodation requests.  He could have engaged in some kind of meaningful interaction process with the Plaintiff.  He could have at least talked to Plaintiff to figure out what this is all about, have assigned someone underneath him to talk to Plaintiff, or authorized Ms. Mew to engage in an interactive process to discuss Plaintiff's reasonable accommodation requests, but he chose not to. All Plaintiff would like is the rightful opportunity to finish his medical education at an AAMC medical school and not allow this discrimination against the mentally ill to happen to others similarly situated as him, now and in the future.  As the top-operational decision maker at the AAMC (TAC ¶ 3), Dr. Skorton has the power to put things in action to make that happen. However, if he is able to hide behind the protective umbrella of the AAMC, then he is most likely not going to do anything.  Plaintiff does not have a vindictive bone in his body, but to actually try to produce meaningful change through some kind of settlement that will allow Plaintiff an opportunity to complete his medical education at an AAMC medical school and avert a trial it helps having the top-operations officer realize that there could be a significant monetary penalty directed towards him if the Court rules in Plaintiff's favor.

## **CONCLUSION**

This lawsuit against the AAMC never had to happen.  Plaintiff has tried through multiple attempts to work things out with the AAMC before and after initiating this litigation so it would

never have had to get to this point.  Plaintiff is not doing this for himself.  He is 44 years old with two young daughters, a 9-month-old and a 2-year-old.  He is doing this because he has true concern about the future.  True concern about the type of world his daughters will grow up in and be a part of, and that their children will grow up in and be part of after he passes.  There is a need to end discrimination in this world and to end hate and violence in this world, especially in our school systems.  To condone discrimination against the mentally ill in our medical education system is a step in the wrong direction because hate only fuels more hate.  As discussed above, failure to include the mentally ill into "the medical school landscape" was also a finding of concern from AAMC's own expert report. TAC ¶¶ 241-243.  Plaintiff is just a messenger.  He does not have all the solutions, but he does truly believe the accommodation requests that he has come up with for the AAMC to implement are steps in the right direction.  He does believe in a future where all discrimination will come to an end and on that day we will all truly join hands, be at peace with each other, and thank God for the blessings he has bestowed upon us all.

Respectfully Submitted,

Date: 12/12/2019

/s/ Jeffrey P. Datto
Jeffrey P. Datto, Ph.D.
Pro Se Plaintiff
3352 w 98th pl
Hialeah, FL 33018
(786) 593-1271
JPDatto@gmail.com

**Request for Hearing**

Plaintiff requests for an oral hearing for this Motion.  This matter involves a complex mixture of educational and public accommodation discriminatory law to which it may have significant long-term implications both locally and nationally.  Plaintiff is also pro se and would like an opportunity for the matter to be fully heard in case there are any deficiencies in his response.  Because Plaintiff's funds right now are limited, having both an 9-month-old daughter and a 2-year-old daughter, if the court doesn't believe such argument will be useful, please disregard this request.  Otherwise, Plaintiff would appreciate for the argument to occur in the afternoon so Plaintiff can fly in from Miami in the morning and fly back out afterwards at night, and to preferably have at least a 2 week notice of the hearing to be able to book the most economical flight.  Alternatively, Plaintiff would appreciate at least a telephonic hearing.

Respectfully Submitted,

Date: 12/12/2019

/s/ Jeffrey P. Datto
Jeffrey P. Datto, Ph.D.
Pro Se Plaintiff
3352 w 98th pl
Hialeah, FL 33018
(786) 593-1271
JPDatto@gmail.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Case No. 1:19-cv-02375-DLF**


JEFFREY PETER DATTO, Ph.D.,

        Plaintiff,

v.

ASSOCIATION OF AMERICAN
MEDICAL COLLEGES et al

        Defendants.

_____/

**[PROPOSED] ORDER**


    This cause came before this Court upon the motion of defendants Association of American Medical Colleges and Dr. David Skorton to dismiss plaintiff's Third Amended Complaint for failure to state a claim.   Having reviewed the parties' briefing and argument of counsel and the pro se plaintiff, the Court finds that plaintiff has not failed to state claims for which relief can be granted for each of his counts.

    It is therefore **ORDERED, ADJUDGED AND DECREED** that this Motion to Dismiss the Third Amended Complaint is DENIED.  The Parties shall hold a telephonic conference as required by LCvR 16.3 and Fed. R. Civ. P. 26(f) within 14 days of the date of this order.


        **SO ORDERED:**


        _____

        Dabney L. Friedrich
        UNITED STATES DISTRICT COURT JUDGE

## **NAMES OF PERSONS TO BE SERVED WITH PROPOSED ORDER**

In accordance to LCvR 7 (k), below is a list of the names and addresses of all attorneys entitled to be notified of its entry:

Robert A Burgoyne
Caroline M. Mew
Perkins Coie LLP
700 13th St., NW, Suite 600
Washington, DC 20005
T: 202 654-6200
F: 202 654-6211
rburgoyne@perkinscoie.com
cmew@perkinscoie.com

Jeffrey P. Datto, Ph.D.
Pro Se Plaintiff
3352 w 98th pl
Hialeah, FL 33018
(786) 593-1271
JPDatto@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 12, 2019, I filed this document using the Courts' CM/ECF system.  I also certify that this document is being served today to Defense counsel by Email.


Date: <u>12/12/2019</u>

/s/ Jeffrey P. Datto
Jeffrey P. Datto, Ph.D.
Pro Se Plaintiff
3352 w 98th pl
Hialeah, FL 33018
(786) 593-1271
JPDatto@gmail.com