**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEFFREY PETER DATTO, Ph.D., | |
| *Plaintiff*, | |
| v. | No. 19-cv-2375 (DLF) |
| ASSOCIATION OF AMERICAN MEDICAL COLLEGES, *et al.*, | |
| *Defendants.* | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Jeffrey Datto brings this action against the Association of American Medical Colleges (the Association) and David Skorton, its President.  Third Am. Compl., Dkt. 205. Before the Court is the defendants' Motion to Dismiss the Third Amended Complaint.  Mot. to Dismiss, Dkt. 206.  For the reasons that follow, the Court will grant the motion.

I.      **BACKGROUND**

A.      **Factual Background**[1]

Jeffrey Datto is a former M.D.-Ph.D. student currently seeking readmission to medical school.  Third Am. Compl. ¶¶ 1, 11, 24.  The Association is a not-for-profit organization based in Washington, D.C., that represents medical schools, teaching hospitals, and academic and scientific societies.  *Who We Are*, AAMC, https://www.aamc.org/who-we-are (last visited July 28, 2020).  David Skorton is President and CEO of the Association.  Third Am. Compl. ¶ 3.

---

[1] Unless otherwise noted, the factual allegations cited in this opinion are drawn from Datto's Third Amended Complaint.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (court considering motion to dismiss must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor").

From 1998 to 2005, Datto was a student at the Thomas Jefferson University medical school, an accredited member school of the Association. *Id.* ¶ 11; Pl.'s Opp'n, Ex. 1, Dkt. 207-1. Datto alleges that he has previously suffered from "bipolar disorder, chronic recurrent depressions, or another equally serious mental illness disorder." Third Am. Compl. ¶ 12. He claims that, as a result of these struggles with his mental health, he did not complete his medical degree at Thomas Jefferson University despite having "made it to the final 3 days of medical school." *Id.* ¶ 18. The university initially agreed to reinstate Datto once he was "medically cleared, agreed to monitoring, and agreed to put the diagnosis of Bipolar Disorder on the Dean's letter that gets sent to all the residency programs he applies to." *Id.* ¶ 19. But according to Datto, "TJU went back on that agreement." *Id.* ¶ 21. After the medical school declined to reinstate Datto, he sued and was awarded a "substantial settlement." *Id.* ¶¶ 21–23.

Datto now seeks to be admitted to another medical school. *See id.* ¶¶ 24, 26–30. In 2015, he applied to 21 medical schools through the Association's application service, but all of those medical schools rejected his application. *See id*. ¶¶ 25, 70; Defs.' Reply Br., Ex. A at 20, Dkt. 208-1. As part of the application process administered by the Association, Datto was required to answer a series of questions about his prior medical education. *See id.* ¶ 53 ("Plaintiff was forced to answer, 'Previous Matriculation' with the follow-up question 'Explanation of Reapplication,' and 'Institutional Action' with the follow-up question 'Explanation of Institutional Action.'"). Datto claims that by requiring answers to these questions, the Association "screened out Plaintiff being an individual with a disability, which prevented the Association medical schools from seriously considering his application." *Id.* ¶ 51. In support of this claim, Datto reasons that "[t]here are many individuals with a disability who, when their disability is not under control . . . will have an academic problem that may have even

been expunged from their record by the academic institution," and should not be "forced by the [Association] to have to disclose this information on their application."  *Id*. ¶ 55.

To address this perceived unfairness, Datto urges the Association to adopt three "reasonable modifications" to its application service.  *Id*. ¶ 58.  First, he asks for the option to decline to answer any questions about his prior medical school history and any prior institutional actions against him.  *See id*. ¶ 59.  Second, if the first modification is not possible, Datto requests that the Association include a new question "asking applicants if they have/had suffered from a disability and for [the Association] to verify the applicant's alleged disability."  *Id*. ¶ 60.  Third, Datto requests that the Association amend its accreditation standard, which currently does not explicitly prohibit medical schools from discriminating on the grounds of disability.  *Id*. ¶ 71–85. Datto would like to apply to medical schools again and "is waiting for the [Association] to grant and implement his accommodation requests before applying again."  *Id*. ¶ 86.

### B.    Procedural History

Datto filed his original complaint against the Association and ten universities on March 20, 2018, in the United States District Court for the Southern District of Florida.  Compl., Dkt. 1. On August 23, 2018, the Association and four of the universities filed a joint motion to dismiss the complaint.  Joint Mot. to Dismiss, Dkt. 55.  Datto filed an Amended Complaint on September 17, 2018.  Am. Compl., Dkt. 62.  The Association moved to dismiss the Amended Complaint for lack of personal jurisdiction on October 15, 2018.  Mot. to Dismiss Am. Compl., Dkt. 76. Instead of dismissing Datto's claims against the Association for lack of personal jurisdiction, the district court severed those claims and transferred them to this court on August 7, 2019.

On September 12, 2019, Datto filed his Second Amended Complaint against the Association and added Skorton, the new President and CEO of the Association, as a named

defendant.  *See* Second Am. Compl., Dkt. 196.  The Association and Skorton filed a motion to dismiss the Second Amended Complaint on September 26, 2019.  Mot. to Dismiss Second Am. Compl., Dkt. 199.  But before that motion was decided, Datto filed yet another motion for leave to amend his complaint, Mot. to Am. Second Am. Compl., Dkt. 204, which this Court granted, Minute Order (Nov. 14, 2019).

Datto's Third Amended Complaint asserts five claims against these two defendants: (1) discrimination in violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182 *et seq.*, against both defendants, *id*. ¶¶ 8–88; (2) discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.,* against the Association, *id.* ¶¶ 89–156; (3) discrimination in violation of the D.C. Human Rights Act (DCHRA), D.C. Code § 2–1402 *et seq.*, against both defendants, *id.* ¶¶ 157–244; (4) breach of contract against the Association, *id.* ¶¶ 245–256; and (5) fraudulent misrepresentation against the Association, *id.* ¶¶ 257-270.  *See* Third Am. Compl.  The defendants filed their motion to dismiss all claims on November 27, 2019.  *See* Mot. to Dismiss.

## II.   LEGAL STANDARD

Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint need not contain "detailed

factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (internal quotation omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation omitted). But the assumption of truth does not apply to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation omitted). An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.   ANALYSIS

### A.   Americans with Disabilities Act

"A plaintiff alleges a violation of Title III of the ADA by asserting that he is an individual with a disability, that the defendant is subject to Title III, and that he was denied an opportunity or benefit from the defendant's services or otherwise was discriminated against because of his disability." *Reeves v. MV Transp., Inc.*, 845 F. Supp. 2d 104, 106–07 (D.D.C. 2012) (citation omitted). *See* 42 U.S.C. § 12182; *Singh v. George Washington Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1105 (D.C. Cir. 2007). The defendants concede that Datto has a disability, *see* Mot. to Dismiss at 10 n.9, but they contend he cannot satisfy the other elements of his claim. Because Datto cannot show that he was denied an opportunity or benefit,

or otherwise was discriminated against because of his disability, the Court need not decide whether the Association is subject to Title III and will deny his ADA claim.

To begin, Datto does not allege that he was denied the use of the Association's application service or that the Association provided that service in a discriminatory manner. To the contrary, Datto had full access to the application service and employed it extensively. Third Am. Compl. ¶ 25 ("Plaintiff applied to 21 medical schools through [the Association's] . . . Application Service."); *see also* Pl.'s Opp'n at 8–9, Dkt. 207. The Association's application service was open to Datto and anyone else with a disability, and these individuals faced no barriers to using that service for its intended purpose—the completion and submission of medical school applications.

Even so, Datto argues that he was "screened out" by the Association because the operation of the service in practice effectively prevented medical schools from considering him. *See, e.g.*, Third Am. Compl. ¶¶ 51 ("[The Association's] centralized application service . . . screened out Plaintiff being an individual with a disability, which prevented . . . medical schools from seriously considering his application."). But as a medical school applicant, Datto had, and continues to have, full access to that service and all of its benefits. And to the extent that his failure to complete medical school at Thomas Jefferson University was held against him in the admissions process, the Association played no role in that admissions decision or any other. The Association merely conveyed information from Datto to medical schools for use in their admissions processes. *See, e.g.*, Mot. to Dismiss, Ex. A at 5, Dkt. 206-1 ("[The Association] is not involved in the admission decision-making process. These decisions are made solely by medical schools.").

Datto further argues that the Association's use of questions about prior medical school experience has a disparate impact on individuals like himself who have mental health-related disabilities that have adversely impacted their previous medical schooling. *See, e.g.*, Third Am. Compl. ¶ 55 ("There are many individuals who, when their disability is not under control, . . . will have an academic problem . . . [and] are being forced . . . to have to disclose this information on their application."). But such questions are both reasonable and relevant to the admissions decisions of medical schools, which may seek to increase or to limit the admission of previous medical students for any number of reasons unrelated to their disabilities. Moreover, any perceived link between the Association's prior medical school history questions and admissions consequences for individuals with disabilities is far too attenuated to give rise to a discrimination claim. Nothing in Datto's complaint approaches a plausible allegation that individuals with disabilities frequently drop out of medical school, that the Association's prior medical school history questions cause these individuals to be viewed in a negative light, or that medical schools regularly reject applicants with disabilities on this basis.

Because the Association provided Datto with full access to its service, his three proposed modifications are not "necessary." 42 U.S.C. § 12182(b)(2)(A)(ii) ("[R]easonable modifications in policies, practices, or procedures" are required only "when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities."). Nor are they reasonable.

First, Datto asks that the Association allow applicants to skip questions concerning their prior medical school history. Third Am. Compl. ¶ 59. But such questions are justified because they assist medical schools in determining who can best contribute to the academic community and take full advantage of the academic opportunities offered.

7

Second, Datto requests that the Association "include a question asking applicants if they have/had suffered from a disability" and then "verify the … alleged disability" if the applicant answers in the affirmative. *Id.* ¶ 60. But the Association has no affirmative obligation to ask about, or verify, an applicant's disability, and applicants are not prevented from disclosing their disabilities in their medical school applications. Indeed, Datto did so in the "Personal Comments" section of his applications. Pl.'s Opp'n, Ex. 2 at 10–11, Dkt. 207-2.

Finally, Datto urges the Association to rewrite the accreditation standards to which its member medical schools are subject. *Id.* ¶¶ 71–87. In particular, Datto requests the inclusion of "disability discrimination" as a component of the Association's anti-discrimination policy. *Id.* ¶ 71. Datto asserts that with this change, the medical schools he applied to "would have taken much more seriously [his] claims that a disability impeded his performance at the end of medical school at [Thomas Jefferson University] . . . ." *Id.* ¶ 85. But Datto's beliefs are entirely speculative, and he provides no basis for his assertion that this change would improve his admissions results. And even though disability discrimination is not mentioned in the Association's accreditation standards, medical schools are independently liable for discrimination against individuals with disabilities under the ADA, the Rehabilitation Act, and other statutes. Therefore, even if the Association were required to consider Datto's proposed accommodations, it would have been fully justified in rejecting them as unreasonable.

## B.    Rehabilitation Act

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Regardless whether the

Association is subject to the Rehabilitation Act, Datto's claim fails for the same reasons outlined above. *See Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) ("Claims and defenses under [Section 504 of the Rehabilitation Act and Title III of the ADA] are virtually identical."); *see also Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004).  As noted, Datto makes no allegation that the Association prevented him from using its application service or otherwise discriminated against him in operating the service.  To the contrary, Datto acknowledges that he was fully able to use the service and that he used it to submit numerous medical school applications.  Pl.'s Opp'n at 8-9.  Because Datto was not "excluded from the participation in, . . . denied the benefits of, or . . . subjected to discrimination under" the Association's application service program, 29 U.S.C. § 794(a), his Rehabilitation Act claim cannot succeed.

### C.     D.C. Human Rights Act

The D.C. Human Rights Act (DCHRA) prohibits denying "any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" based on disability.  D.C. Code § 2-1402.31.  Again, even assuming that the Association is a public accommodation to which the DCHRA applies, Datto's claim fails because he had full use of the Association's application service and was not denied equal enjoyment of the privileges or benefits thereof.

To the extent that Datto intends to advance a distinct claim of retaliation under the DCHRA, *see* Pl.'s Opp'n at 19, this claim also fails.  First, the Association has not taken any adverse action against Datto.  "To meet the prima facie elements for a claim of retaliation, a plaintiff must demonstrate that . . . he was subjected to adverse action . . . ." *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 84 (D.D.C. 2003).  The policies and procedures which

Datto protests have existed since before Datto initiated this litigation in 2018, Third Am. Compl. ¶ 251, and their continued existence is not evidence of any purported animus toward Datto on the part of the Association.  Second, insofar as Datto's claim is based on the Association's denial of his requested accommodations, it simply restates the facts of the failure-to-accommodate claim that he has already advanced under the ADA and the Rehabilitation Act.  Courts have refused to allow plaintiffs to recast their failure-to-accommodate allegations as retaliation claims.  *See, e.g., Exby-Stolley v. Bd. of Cnty. Comm'rs*, 906 F.3d 900, 918 (10th Cir. 2018); *Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled.").  Therefore, whether Datto intends to proceed based on a retaliation theory or a more garden-variety theory of discrimination, he has not stated a claim under the DCHRA.

### D.      Breach of Contract

"In the case of a claim for breach of contract, the complaint must allege four necessary elements . . . : (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 171–72 (D.D.C. 2017) (internal quotation and citation omitted).  Datto alleges that the Association "offered [Datto] the potential ability to be fairly and non-discriminatively [sic] screened and evaluated for acceptance into medical school in exchange for taking their MCAT exam, filling out their [] application, and paying their required fees for both." Third Am. Compl. ¶ 245.  He claims that the Association breached its contract by "allowing disability discrimination to occur" and refusing to modify its Anti-Discrimination Policy. *Id.* ¶ 255.  These allegations fail to state a claim for breach of contract.

Even assuming that Datto's use of the Association's application service gave rise to a valid contract between the Association and Datto, he has shown neither "an obligation or duty arising out of the contract" nor "a breach of that duty." *Bradley*, 249 F. Supp. 3d at 171–172 (internal quotation and citation omitted).  First, the purported "obligation" on which Datto seeks to rely comes from the 2017 instruction manual for the application service, which states that "the [Association] must ensure high ethical standards for admission to and enrollment in medical schools."  Mot. to Dismiss, Ex. A at 12.  But the very next sentence of the instruction manual states: "Accordingly, if you are an applicant to medical school . . . you must provide complete, current, and accurate information throughout the admission and examination processes."  *Id.* When taken together, these two statements clearly refer to the Association's obligation to police the integrity of *applicants*.  Neither this statement nor any other in the 2017 instruction manual suggests that the Association had a contractual obligation to Datto with respect to the *medical schools'* admissions decisions.  Quite the contrary: the guide contains an explicit disclaimer that "[the Association] is not involved in the admission decision-making process" and that all admissions decisions "are made solely by medical schools."  *Id.* at 6.  Therefore, the purported contractual obligation upon which Datto bases his breach of contract claim—at least as Datto interprets it—does not, in fact, exist.

But even if Datto had correctly interpreted the 2017 instruction manual to contain a contractual obligation on the part of the Association and/or the medical schools themselves, the Association did not breach that duty.  As discussed, the Association provided full use of its application service to Datto when he applied to 21 medical schools in 2017, Third Am. Compl. ¶¶ 25, 251, and it took no part in any discriminatory admissions decisions purportedly made by

11

the medical schools, Mot. to Dismiss, Ex. A at 6.  Datto's breach of contract claim therefore

fails.

      **E.**      **Fraudulent Misrepresentation**

      "The essential elements of common law fraud are: (1) a false representation (2) in

reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive,

and (5) action is taken in reliance upon the representation."  *Bennett v. Kiggins*, 377 A.2d 57, 59

(D.C. 1977).  Datto's fraudulent misrepresentation claim relies on the same "high ethical

standard" language from the 2017 instruction manual that he misconstrues in his breach of

contract claim.  Third Am. Compl. ¶ 260.  As noted, the 2017 instruction manual makes no

promises to applicants with respect to the independent decisions that third-party medical schools

make on applications for admission; the quoted language addresses improper behavior by

applicants, not the Association.  But even crediting Datto's flawed interpretation of the manual,

the Association did not fail to offer the Datto "the potential ability to be fairly . . . screened and

evaluated for acceptance into medical school," *id.* ¶ 245, because nothing in Datto's allegations

shows that the Association provided the application service in a discriminatory manner.  Because

Datto has not identified a "false representation" on the part of the Association, *Bennett*, 377 A.2d

at 59, Datto's fraudulent misrepresentation claim fails.

## CONCLUSION

      For the foregoing reasons, the defendants' motion to dismiss is granted. A separate order

consistent with this decision accompanies this memorandum opinion.

 

                                    _____
                                    DABNEY L. FRIEDRICH

August 25, 2020                        United States District Judge